UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| CALIFORNIA DAIRIES INC., | 1:08-CV-00790 OWW GSA |
|---|---|
| Plaintiff, | ORDER RE DEFENDANT'S MOTION FOR TO DISMISS (DOC. 10) |
| v. | |
| RSUI INDEMNITY CO., | |
| Defendant. | |

## I.  INTRODUCTION

This case concerns a directors and officers liability insurance policy ("the Policy") issued to Plaintiff, California Dairies, Inc. ("CDI"), by RSUI Indemnity Company ("RSUI").  RSUI denied coverage for claims asserted against CDI in a class action filed in Tulare County Superior Court, *Gonzalez v. CDI*, Case No. 08-226450 ("*Gonzalez*" or the "Underlying Action"), in which employees and former employees of CDI allege CDI violated various provisions of the California Labor Code ("CLC") concerning wages, hours, and related matters.

RSUI initially denied coverage based on three different exclusionary provisions.  Upon the insured's request for reconsideration, RSUI based the denial solely on Exclusion 4 of the Policy, which excludes coverage for "violation of any of the

1

1  responsibilities, obligations or duties imposed by ... the Fair
2  Labor Standards Act ... or any similar provision of federal,
3  state or local statutory law or common law...."  CDI then filed
4  this action seeking declaratory relief regarding coverage under
5  the Policy.

6

7                    II.  **BACKGROUND**

8       A.   The Underlying *Gonzalez* Lawsuit.

9       On January 4, 2008, Walter Gonzalez filed a class action
10 complaint against CDI in Tulare County Superior Court.  Complaint
11 ¶7; *see* Defendant's Request for Judicial Notice, Doc. 12, Ex. B
12 ("*Gonzalez* Compl.").[1]  The *Gonzalez* Complaint alleges causes of
13 action for: 1) failure to pay minimum wage; 2) failure to pay
14 regular and overtime wages; 3) failure to provide mandated meal
15 periods or pay an additional hour of wages; 4) failure to provide
16 mandated rest periods or pay an additional hour of wages; 5)
17 failure to reimburse employees for costs incurred to acquire
18 and/or maintain company-required uniforms; 6) knowing and
19 intentional failure to comply with itemized wage statement
20 provisions; and 7) failure to timely pay wages due at
21 termination.  Compl. at ¶7; *Gonzalez* Compl. (alleging violations
22 of CLC §§ 200, 201, 202, 203, 204, 218, 218.6, 221, 223, 226.7,
23 500, 510, 512, 1194, 1194.2, & 2802.)  The *Gonzalez* Complaint
24 also alleges that CDI violated California's Unfair Competition
25 Law, Cal. Bus. Prof. Code § 17200, *et seq.*, as a result of CDI's

26 ────────────────────

27       [1]   A court may take judicial notice of the authenticity
   and existence of pleadings in other actions.  *See United States
28 v. S. Cal. Edison Co.*, 300 F. Supp. 2d 964, 973 (E.D. Cal. 2004).

                           **2**

alleged violations of the CLC. *Id.* No violation of the FLSA was alleged. *Id.*

    B. <u>The Relevant Terms and Conditions of the Policy.</u>

California Dairies is the named Insured, as the "Insured Organization" under the Policy. Compl. ¶5. Under the Policy's Insuring Agreement set forth at Section I(C), RSUI agrees:

> With the <u>Insured Organization</u> that if a <u>Claim</u> for a <u>Wrongful Act</u> is first made against the <u>Insured Organization</u> during the Policy Period and reported in accordance with SECTION V. – CONDITIONS, C. Notice of Claim and Circumstance of this policy, the <u>Insurer</u> will pay on behalf of the <u>Insured Organization</u> all <u>Loss</u> the <u>Insured Organization</u> is legally obligated to pay.

*See* Defendant's Request to Submit Evidence, Doc. 11, at p. 32 of 44 (underlined text is bold in original).[2]

The Policy does not contain a duty to defend, but instead contains a duty to reimburse defense costs. *Id.* at p. 11 of 44 (Advancement of Defense Expenses; Insurer Has No Duty to Defend).

"Insured" is defined at Section III(G) of the Policy as "any Insured Organization and/or any Insured Person." *Id.* at p. 34 of 44. "Insured Organization" is defined as "the organization named in Item 1 of the Declarations Page...." *Id.* (Section III(H)). "Insured Person" is "any past, present or future director, officer, trustee, Employee, volunteer, or any committee member of

---

[2] Although generally a district court may not consider material beyond the pleadings on a Rule 12(b)(6) motion, a document to which the complaint specifically refers may be considered if its authenticity is not questioned. *Inlandboatmens Union of Pac. v. Dutra Group.*, 279 F.3d 1075, 1083 (9th Cir. 2002). Here, as the authenticity of the Policy presented by Defendants is not questioned, it may be considered.

a duly constituted committee of the Insured Organization."  *Id.*
(Section III(I)).  "Employee" is defined as "any past, present or
future employee of the Insured Organization...."  *Id.* (Section
II(D)).  "Employment Practices Claim" is "any Claim alleging an
Employment Practices Wrongful Act."  *Id.* at p. 33 of 44 (Section
II(E)).

 An "Employment Practices Wrongful Act" is defined at Section
II(F) of the Policy as any actual or alleged:

> 1.   Wrongful dismissal, discharge or termination
> (either actual or constructive) of employment,
> including breach of an implied employment contract;
>
> 2.   Employment related harassment (including but not
> limited to sexual harassment);
>
> 3.   Employment-related discrimination (including but
> not limited to discrimination based on age, gender,
> race, color, national origin, religion, sexual
> orientation or preference, pregnancy or disability);
>
> 4.   Employment-related retaliation;
>
> 5.   Employment-related misrepresentation to an
> Employee or applicant for employment with the Insured
> organization;
>
> 6.   Libel, slander, humiliation, defamation or
> invasion of privacy (solely when employment related);
> 7.   Wrongful failure to promote;
>
> 8.   Wrongful deprivation of career opportunity,
> wrongful demotion or negligent Employee evaluation,
> including giving defamatory statements in connection
> with an Employee reference;
>
> 9.   Employment related wrongful discipline;
>
> 10.  Failure to grant tenure or practice privileges;
>
> 11.  Failure to provide or enforce adequate and
> consistent organization policies or procedures relating
> to employment;
>
> 12.  Violations of the following federal laws (as
> amended) including all regulations promulgated
> thereunder: a. Family and Medical leave Act of 1993; b.
> Americans with Disabilities Act of 1992 (ADA); c. Civil

4

1   Rights Act of 1991; d. Age Discrimination in Employment
2   Act of 1967 (ADEA), including the Older Workers Benefit
    Protection Act of 1990; or e. Title VII of the Civil
3   Rights Law of 1964 (as amended) and 42 U.S.C. Section
    1983, as well as the Pregnancy Discrimination Act of
    1978;

4
        13.   Violation of an Insured Person's civil rights
5       relating to any of the above; or

6       14.   Negligent hiring, retention, training or
        supervision, infliction of emotional distress, failure
7       to provide or enforce adequate or consistent
        organizational polices and procedures, or violation of
8       an individual's civil rights, when alleged in
        conjunction with respect to any of the foregoing items
9       1 through 13.

10  *Id.*

11      C.   <u>The Relevant Exclusions of the Policy.</u>

12      The Policy also contains a number of specific exclusions,

13  two of which are at issue in this case.  The Policy provides that

14  the Insurer shall not be liable to make any payment for "Loss" in

15  connection with any "Claim" made against the "Insured":

16      4. For violation of any of the responsibilities,
        obligations or duties imposed by the Employees
17      Retirement Income Security Act of 1974, *the Fair Labor
        Standards Act* (except the Equal Pay Act), the National
18      Labor Relations Act, the Worker Adjustment and
        Retraining Notification Act, the Consolidated Omnibus
19      Budget Reconciliation Act, the Occupational Safety &
        Health Act, any rules or regulations of any of the
20      foregoing promulgated thereunder, and amendments
        thereto *or any similar provision of federal, state or
21      local statutory law or common law*; provided this
        EXCLUSION shall not apply to <u>Loss</u> arising from a <u>Claim</u>
22      for employment related retaliation.

23                              ***

24      7. Brought by or on behalf of any <u>Insured</u>,
        except:...(b) an <u>Employment Practices Claim</u> brought by
25      an <u>Insured Person</u>..."

26  *Id*. at p. 35 of 44 (underlined words bolded in original; italic

27  emphasis added).  The Policy defines "Loss" at Section II(K) as

28  follows:

                              5

> **Loss** means damages (including back pay and front pay),
> settlement, judgments (including pre- and post-judgment
> interest on a covered judgment) and **Defense Expenses**.
> Loss (other than **Defense Expenses**) shall not
> include:... 5. Any amounts owed as wages to any
> Employee, other than front pay or back pay; 6. Civil or
> criminal fines or penalties.

*Id*. at p. 34 of 44 (underlined words bolded in original).


### D. Tender of Claim and Response Thereto.

On February 15, 2008, CDI tendered the *Gonzalez* action to
RSUI pursuant to the Policy. Compl. at ¶10. On March 3, 2008,
RSUI denied coverage, asserting three specific exclusionary
provisions. *Id*. at ¶11. RSUI did not assert Exclusion 7 as a
basis to deny coverage. *Id*. On May 5, 2008, CDI requested that
RSUI reconsider its denial of the claim. *Id*. at ¶12. On May 14,
2008, RSUI conceded that two of the previously asserted
exclusionary provisions (grounds) would not apply, absent a final
and specific adjudication of certain conduct as against CDI. *Id*.
at ¶14. The only exclusionary provision RSUI relied on to deny
coverage outright for the claim was Exclusion 4. *Id*.


## III. STANDARD OF DECISION

Federal Rule of Civil Procedure 12(b)(6) provides that a
motion to dismiss may be made if the plaintiff fails "to state a
claim upon which relief can be granted." In deciding whether to
grant a motion to dismiss, the court "accept[s] all factual
allegations of the complaint as true and draw[s] all reasonable
inferences" in the light most favorable to the nonmoving party.
*TwoRivers v. Lewis*, 174 F.3d 987, 991 (9th Cir. 1999); *see also*
*Rodriguez v. Panayiotou*, 314 F.3d 979, 983 (9th Cir. 2002).

"To avoid a Rule(b)(6) dismissal, a complaint need not contain detailed factual allegations; rather, it must plead 'enough facts to state a claim to relief that is plausible on its face.'" *Weber v. Dept. of Veterans Affairs*, 521 F.3d 1061 (9th Cir. 2008) (citing *Bell Atlantic v. Twombly*, 127 S. Ct 1955, 1974 (2007) (rejecting interpretation of Rule 8 that permits dismissal only when plaintiff can prove "no set of facts" in support of his claim).  A court is not "required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).

## IV.  ANALYSIS

### A.   Interpretation of Insurance Policies in California.

Interpretation of an insurance policy is a question of law and follows the general rules of contract interpretation. *MacKinnon v. Truck Ins. Exch.*, 31 Cal. 4th 635, 647-48 (2003).

> The fundamental rules of contract interpretation are based on the premise that the interpretation of a contract must give effect to the "mutual intention" of the parties....Such intent is to be inferred, if possible, solely from the written provisions of the contract.

*Id.* (citing Cal. Civ. Code § 1639).  The "clear and explicit" meaning of policy provisions, interpreted in their "ordinary and popular sense," controls, unless the terms are "used by the parties in a technical sense or a special meaning is given to them by usage."  *Id.* (citing Cal. Civ. Code § 1644).[3]

_____

[3]     Under most circumstances, when interpreting policy provisions, undefined terms should be interpreted as laymen would

7

A policy provision will be considered ambiguous "when it is capable of two or more constructions, both of which are reasonable." *Id.* "But language in a contract must be interpreted as a whole, and in the circumstances of the case, and cannot be found to be ambiguous in the abstract." *Id.*

In addition to applying general rules of contract interpretation, insurance agreements are interpreted broadly in favor of the policyholder. *Montrose Chem. Corp. v. Admiral Fin. Co.*, 10 Cal. 4th 645, 667 (1995). In keeping with this general rule,

> [I]nsurance coverage is interpreted broadly so as to afford the greatest possible protection to the insured, whereas exclusionary causes are interpreted narrowly against the insurer. An insurer cannot escape its basic duty to insure by means of an exclusionary clause that is unclear. As we have declared time and again any exception to the performance of the basic underlying obligation must be so stated as clearly to apprise the insured of its effect. Thus, the burden rests upon the insurer to phrase exceptions and exclusions in clear and unmistakable language. The exclusionary clause <u>must be conspicuous, plain and clear</u>.

*MacKinnon*, 31 Cal. 4th 635 (emphasis in original).

The overall approach that emerges from these doctrines is articulated in *Spangle v. Farmers Ins. Exch.*, 166 Cal. App. 4th 560, 567 (2008):

---

read them, not as they might be analyzed by an attorney or insurance expert. *Lebas Fashion Imports of USA Inc. v. ICT Harftord Ins. Group,* 50 Cal. App. 4th 548, 559 (1996). Dictionary definitions may be useful, but a court must not "make a fortress out of the dictionary," by disregarding the policy's context. *MacKinnon*, 31 Cal. 4th at 649. Rather, a court must "put itself in the position of a layperson and understand how he or she might reasonably interpret the exclusionary language." *Id.*

> If an asserted ambiguity is not eliminated by the
> language and context of the policy, courts then invoke
> the principle that ambiguities are generally construed
> against the party who caused the uncertainty to exist
> (i.e. the insurer) in order to protect the insured's
> reasonable expectation of coverage.

(internal citations and quotations omitted).

The absence from a policy of a definition of a word or phrase does not by itself necessarily create an ambiguity. *Bay Cities Paving & Grading, Inc. v. Lawyers' Mutual Ins. Co.*, 5 Cal. 4th 854, 867 (1993).

> Any rule that rigidly presumed ambiguity from the
> absence of a definition would be illogical and
> unworkable. To avoid ... ambiguity... , an insurer
> would have to define every word in its policy, the
> defining words would themselves then have to be
> defined, their defining words would have to be defined,
> and the process would continue to replicate itself
> until the result became so cumbersome as to create
> impenetrable ambiguity.

*Id.* at 865. Even when interpreting insurance policies, a court must look to the common understanding of the language, with an eye to reasonableness and context. *Id.* at 867.

> First, an insurance policy provision is ambiguous when
> it is capable of two or more constructions <u>both of
> which are reasonable</u>. Courts will not adopt a strained
> or absurd interpretation in order to create an
> ambiguity where none exists. Second, [l]anguage in a
> contract must be construed in the context of that
> instrument as a whole, and in the circumstances of that
> case, and cannot be found to be ambiguous in the
> abstract. There cannot be an ambiguity per se, i.e., an
> ambiguity unrelated to an application.

*Id.* (internal citations and quotations omitted)(emphasis added). "Multiple or broad meanings do not necessarily create ambiguity." *Id.* at 868. "A word with a broad meaning or multiple meanings may be used for that very reason - its breadth - to achieve a broad purpose." *Id.*

The reasoning in *Bay Cities* is instructive. In that case,

9

the California Supreme court interpreted a professional liability insurance policy containing a provision limiting coverage to a maximum of $250,000 "for each claim." The policy further provided that, "Two or more claims arising out of a single act, error or omission or a series of related acts, errors or omissions shall be treated as a single claim." *Id.* at 857. Applying the general principles of insurance policy interpretation articulated above, the *Bay Cities* court reasoned:

> "Related" is a commonly used word with a broad meaning that encompasses a myriad of relationships. For example, a leading legal dictionary defines "related" to mean "standing in relation; connected; allied; akin." (Black's Law Dict. (6th ed. 1990) p. 1288, col. 1.) Similarly, a legal thesaurus lists many synonyms for "related." (Burton, Legal Thesaurus (1980) p. 925, col. 2.) In a coverage case (not involving a claim limitation), the court observed that "related" can denote a causal connection as well as the "notion of similarity." (*O'Doan v. Insurance Co. of North America* (1966) 243 Cal.App.2d 71, 78.)
>
> Although "related" is broad enough to encompass both logical as well as causal relationships, the Court of Appeal incorrectly found an inherent ambiguity. Multiple or broad meanings do not necessarily create ambiguity. For example, assume that an insurance policy excluded coverage for any claim arising from the operation of a "motor vehicle." Obviously, a "motor vehicle" could be either an automobile or a truck, but that does not mean it must be only one or the other, rather than both. Likewise here, the fact that "related" can encompass a wide variety of relationships does not necessarily render the word ambiguous. To the contrary, a word with a broad meaning or multiple meanings may be used for that very reason-its breadth-to achieve a broad purpose. We need not, however, belabor the question of whether "related" is ambiguous in the abstract or in some hypothetical circumstance. That is not the question.
>
> The proper question is whether the word is ambiguous in the context of this policy and the circumstances of this case. (Bank of the West v. Superior Court, supra, 2 Cal.4th 1254, 1265.) The provision will shift between clarity and ambiguity with changes in the event at hand. (*O'Doan v. Insurance Co. of North America*, *supra*, 243 Cal.App.2d 71, 77.) The linchpin of Bay Cities'

10

> argument is that "related" is ambiguous because it could have either a broad meaning, for example, meaning all services rendered by the attorney in connection with this particular matter, or, alternatively, a narrower meaning, that is, only those acts by the attorney that are causally related. The precise and narrow question is thus whether "related" in an attorney's professional liability insurance policy is ambiguous because the word is reasonably susceptible to both of these meanings.

*Id.* at 868 (parallel citations omitted).

Here, the proper inquiry is whether the Policy language, specifically the word "similar," when viewed in the context of Policy's overall structure and the circumstances of this case, is reasonably susceptible to the interpretation advanced by CDI. Although CDI does not clearly articulate a suggested interpretation, its legal position implies an interpretation of "similar" that means "identical" or "alike."  Only if the Policy language is deemed ambiguous does a court interpret that language against the insurer.

    B.    **Is the Term "Similar" in Exclusion 4 Ambiguous?**

RSUI relied upon Exclusion 4 to deny coverage in this case, which provides that the "Insurer" will not be liable for "Loss" in connection with any "Claim" made against the "Insured":

> 4. For violation of any of the responsibilities, obligations or duties imposed by the Employees Retirement Income Security Act of 1974, *the Fair Labor Standards Act* (except the Equal Pay Act), the National Labor Relations Act, the Worker Adjustment and Retraining Notification Act, the Consolidated Omnibus Budget Reconciliation Act, the Occupational Safety & Health Act, any rules or regulations of any of the foregoing promulgated thereunder, and amendments thereto *or any similar provision of federal, state or local statutory law or common law*; provided this EXCLUSION shall not apply to <u>Loss</u> arising from a <u>Claim</u> for employment related retaliation.

11

Doc. 11 at p. 35 of 44 (underlined text bold in original; italic emphasis added). RSUI maintains that the provisions of the CLC relied upon by the *Gonzalez* plaintiffs are "similar" to the Fair Labor Standards Act ("FLSA"), triggering operation of Exclusion 4. CDI argues that the term "similar" is ambiguous and therefore must be interpreted in favor of the insured.

No court within California has addressed the specific issue of whether the FLSA and California wage and hour laws codified in the CLC are "similar" for purposes of interpreting an insurance policy. RSUI argues that, in the context of the Policy, the term "similar" should be interpreted according to its dictionary definition as "having characteristics in common," citing Merriam-Webster Online Dictionary (ed. 2008).

In support of its position that the exclusion applies here, RSUI cites *Payless Shoesource, Inc. v. Travelers Companies, Inc.*, 569 F. Supp. 2d 1189 (D.C. Kan. 2008), in which the insured sought coverage for a class action lawsuit alleging: (a) recovery of unpaid wages and penalties and failure to pay wages at the time of separation, in violation of the CLC; as well as (b) unfair business practices. The insurer denied coverage based on the following exclusion:

> The Insurer shall not be liable for Loss on account of any Claim made against any Insured:
>
> ...for an actual or alleged violation of the <u>**Fair Labor Standards Act**</u> (except the Equal Pay Act), the National Labor Relations Act, the Worker Adjustment and Retraining Notification Act, the Consolidated Omnibus Budget Reconciliation Act of 1985, the Occupational Safety and Health Act, the Employee Retirement Income Security Act of 1974, any workers' compensation, unemployment insurance, social security, or disability benefits law, <u>**other similar provisions of any federal, state, or local statutory or common law or any**</u>

> **amendments, rules or regulations promulgated under any of the foregoing**; provided, however, this exclusion shall not apply to any Claim for any actual or alleged retaliatory treatment on account of the exercise of rights pursuant to any such law, rule or regulation.

*Id.* at 1193 (emphasis added). The insurer argued that the exclusion negated coverage because the alleged CLC violations and the FLSA were "similar." *Id.* Payless argued, among other things, that the exclusionary language was ambiguous, and that the claims in the underlying litigation were not similar enough to FLSA claims to be covered by the exclusion.[4] *Id.* at 1196. In arguing for a finding of ambiguity, Payless relied on the "last antecedent rule," arguing that the exclusionary language "other similar provisions of any federal, state, or local statutory or common law or any amendments, rules or regulations promulgated under any of the foregoing" applied only to the immediately preceding language "any workers' compensation, unemployment insurance, social security, or disability benefits law." *Id.* at 1197. The *Payless* court rejected this argument, reasoning:

> The plain meaning of [the] language, which would be apparent to any reasonably prudent insured, is that the modifier applies to each item in the preceding series.... These strong indicia of meaning overcome the need to utilize the last antecedent rule.

*Id.*

The *Payless* court next examined Payless' argument that the exclusionary language -- "other similar provisions of any federal, state, or local statutory or common law or any

---

[4] To interpret the policy provisions, the *Payless* court applied Kansas law, which follows an analytical framework essentially identical to that used in California. *Id.* at 1195-96.

amendments, rules or regulations promulgated under any of the foregoing" -- should be interpreted to apply to "similar provisions ... of state ... law," rather than "similar ... state ... law[s]." *Id*. at 1198 (emphasis added). More specifically, Payless argued that the exact provisions raised in the underlying litigation regarding rest and meal breaks and overtime pay by day, rather than by week, exist only in the CLC, not the FLSA. *Id*. The defendant insurer responded "that the California wage and hour provisions are 'similar' to the FLSA and that they need not be identical to the FLSA in order to be covered by the exclusion." *Id*. The *Payless* court agreed:

> The FLSA requires employers to pay their employees who are engaged in interstate commerce at least time and a half for any hours worked in excess of forty hours in any workweek. Rest periods of short duration are counted as hours worked under the FLSA, but "bona fide meal periods' are not considered worktime. Plaintiff argues that the FLSA, unlike California law, does not require rest periods, meal periods, compensation for either. Plaintiff also focuses on the California requirement that overtime be paid for hours worked in excess of eight hours per day rather than the forty hour work-week as required by the FLSA. But the provisions of the state law, under the plain language of the exclusion, only need be similar and not identical to provisions of the FLSA. Here, while the FLSA may not mandate certain rest and meal periods, it does provide for when those periods must be compensated for. Moreover, the overtime provisions are undisputedly "similar." Plaintiff admits that the only difference is whether overtime is calculated daily or weekly. <u>Because the exclusion language is not ambiguous or unclear, there is no need to construe the language against defendant, the insurer</u>.

*Id*. at 1098-99.

The policy language at issue here is similar to that in *Payless*.

| Exclusionary Provision in *Payless* | Exclusionary Provision in this case |
|---|---|
| The Insurer shall not be liable for Loss on account of any Claim made against any Insured: "...for an actual or alleged violation of the <u>Fair Labor Standards Act</u> (except the Equal Pay Act), the National Labor Relations Act, the Worker Adjustment and Retraining Notification Act, the Consolidated Omnibus Budget Reconciliation Act of 1985, the Occupational Safety and Health Act, the Employee Retirement Income Security Act of 1974, any workers' compensation, unemployment insurance, social security, or disability benefits law, <u>other similar provisions of any federal, state, or local statutory or common law or any amendments, rules or regulations promulgated under any of the foregoing</u>; provided, however, this exclusion shall not apply to any Claim for any actual or alleged retaliatory treatment on account of the exercise of rights pursuant to any such law, rule or regulation. | The Insurer shall not be liable to make any payment for "Loss" in connection with any "Claim" made against the "Insured": "For violation of any of the responsibilities, obligations or duties imposed by the Employees Retirement Income Security Act of 1974, <u>the Fair Labor Standards Act</u> (except the Equal Pay Act), the National Labor Relations Act, the Worker Adjustment and Retraining Notification Act, the Consolidated Omnibus Budget Reconciliation Act, the Occupational Safety & Health Act, any rules or regulations of any of the foregoing promulgated thereunder, and amendments thereto <u>or any similar provision of federal, state or local statutory law or common law</u>; provided this EXCLUSION shall not apply to Loss arising from a Claim for employment related retaliation. |

CDI argues that the *Payless* decision should be given limited, if any, weight because of "the brevity of the court's analysis." Doc. 17 at 20. CDI cites *Morillon v. Royal Packing Co.*, 22 Cal. 4th 575 (2000), for the proposition that the California Supreme Court demands a "cautioned, deliberate analysis" when evaluating the similarity of the FLSA to the CLC. Doc. 17 at 20. But, *Morillon* is not on point. The passage CDI cites addresses the weight a California court should give federal authority when <u>interpreting</u> a California wage order. *Id*. at 588. To determine the weight that should be afforded federal authority under such circumstances, a court must carefully examine "what aspect or characteristic of these two extensive statutory schemes

make their thrusts similar." *Id*. at 588. In *Morillion*, the California Supreme Court was concerned with whether, in interpreting a California wage order, California court should follow federal precedent <u>interpreting the FLSA</u>. *Morillion* noted that "in discussing federal authority ... the Court of Appeal failed to compare the federal definition of 'hours worked' to the state definition under Wage Order No. 14-80. While one of our lower courts has recognized the 'parallel' nature of the federal and state definitions of 'hours worked' [citation], the [Division of Labor Standards Enforcement] has underscored the substantial differences between the federal and state definitions in numerous advice letters." *Id*. at 589. The *Morillion* court eventually declined to decide the propriety of considering the federal authority, reasoning:

> [W]e do not believe the similarity or differences between the two definitions of "hours worked" is dispositive of whether plaintiffs' compulsory travel time is compensable under state law. Instead, we find that the Portal-to-Portal Act, which expressly and specifically exempts travel time as compensable activity under the FLSA (29 U.S.C. § 254), should be the focus of our comparative analysis.

*Id*. *Morillion* does not undermine the persuasiveness of *Payless*, in which the court gave full consideration to the necessary principles of contract interpretation.[5]

---

[5]     CDI makes two additional arguments concerning *Payless*. First, CDI notes that, in *Payless*, the plaintiff admitted that the only difference between the CLC and FLSA overtime provision "is whether overtime is calculated daily or weekly."  569 F. Supp. 2d at 1199.  CDI emphasizes that it is making no such concession.  In addition, CDI correctly points out that the *Payless* court did not evaluate each of the California laws that serve as the basis for the *Gonzalez* action.  These arguments go to whether or not the relied-upon provisions of the CLC are or

Further support for a finding that Exclusion 4 is not ambiguous comes from *Farmers Auto. Ins. Ass'n v. St. Paul Mercury Ins. Co.*, 482 F.3d 976 (7th Cir. 2007), a case cited with approval in *Payless*, 569 F. Supp. 2d at 1199. In *Farmers*, the insured sought coverage for a class action claim seeking overtime compensation under the Illinois Minimum Wage Law. The insurer denied coverage based on an exclusion in its policy for:

> any actual or alleged violation of the <u>Fair Labor Standards Act</u> (except the Equal Pay Act), the National Labor Relations Act, the Worker Adjustment and Retraining Notification Act, the Consolidated Omnibus Reconciliation Act of 1983, the Occupational Safety and Health Act, any workers compensation, unemployment insurance, social security, or disability benefits law, other similar provisions of any federal, state, <u>or local statutory or common law or any rules or regulations promulgated under any of the foregoing</u>.

*Id*. at 977 (emphasis added).

Finding that state wage and hour provisions are similar to the FLSA, the Seventh Circuit stated, "the language [of the policy] is not addressed to the average person, but to employers, and they know what the Fair Labor Standards Act is, know there are state counterparts, and could not think they'd bought insurance that would enable them to disregard the state overtime provisions." *Id*. at 979. The Seventh Circuit emphasized that the purpose of the exclusionary language, equally applicable to both statutes, "is to avoid 'moral hazard,' which, in its most extreme form, is the temptation of an insured to precipitate the event insured against if the insurance goes beyond merely replacing a loss." *Id*.

are not "similar" to the FLSA. They have nothing to do with whether or not Exclusion 4 is ambiguous.

17

> Insurance against a violation of an overtime law, whether federal or state, would enable the employer to refuse to pay overtime and then invoke coverage so that the cost of the overtime would come to rest on to the insurance company. The employer would have violated the overtime law with impunity, unjustly enriching itself by the difference between the overtime wage for the hours in question and the straight wage. No insurance company would knowingly write a policy that would enable the insured to trigger coverage any time it wanted a windfall.

*Id.*

CDI is correct that *Farmers* concluded that the Illinois Minimum Wage Law and the FSLA impose the "identical requirement except that [the Illinois law] is not limited to employers who operate in interstate commerce." *Id.* at 978. CDI also correctly asserts that "the *Farmers* court was never required to determine whether two laws that, while both dealing with the concept of minimum wage, treat the issue in vastly different ways as in the instant case...." Doc. 17 at 22. *Farmers* is distinguishable in that the policyholder was an insurance company that used the term "similar" throughout its own policies. *Farmers*, 482 F.3d at 978. *Farmers* is not direct authority aiding interpretation of the exclusionary language in this case.

Nonetheless, the Seventh Circuit's articulation of the purpose of similar exclusionary language is relevant. *Farmers* was concerned that insured employers would purposefully not pay overtime or other wages due, reaping a windfall if they were later called to account and their policies were interpreted to require the Insurer to pay any wages due. In this light, CDI's proffered interpretation of Exclusion 4, as applicable only to claims brought under provisions of the CLC that are identical (or nearly identical) to provisions in the FLSA, is not reasonable

18

and supports insured conduct violative of public policy. The result would be that the insured could violate any provision of the CLC which would trigger coverage, creating a windfall.

CDI argues the "moral hazard" discussion in *Farmers* is unpersuasive, because it "places a burden of policy interpretation on the policyholder that is not in keeping with California's well-established laws requiring that insurance policies be construed against the insurer." Doc. 17 at 23. This exalts a rule of interpretation over a stronger public policy of discouraging labor law violations, and minimizes the doctrine that a policy is only construed against the insurer when the policy language is ambiguous and the ambiguity is not eliminated by the language and context of the policy. *See Spangle*, 166 Cal. App. at 567. Where, as here, the Policy explicitly and clearly excludes coverage for a certain category of unlawful acts, the exclusion is enforceable. *See General Reinsurance Corp. v. St. Jude Hospital*, 107 Cal. App. 4th 1097, 1107-108 (2003).[6]

CDI cites a number of factually distinguishable cases where an insurer's use of the term "similar" was found to be inherently ambiguous and the inherent ambiguity was resolved in favor of the policyholder. In *Motor's Insurance Corporation v. Bodie*, 770 F.

---

[6]     CDI suggests that the Policy expressly covers wage and hour violations because it provides coverage for "front and back pay." Specifically, Section III(K)(5) excludes from the definition of "Loss" "any amounts owed as wages to any Employee, other than front pay or back pay." CDI completely ignores the thrust of this provision, which is to exclude wages owed to any Employee. The terms "front" and "back" pay are terms of art commonly used in the context of discrimination claims, which are covered Employment Practices Wrongful Acts.

Supp. 547 (E.D. Cal. 1991), the insurer argued that the
policyholder's automobile coverage had automatically terminated
under a clause that provided:

> If you obtain other insurance on "your covered auto,"
> <u>any similar insurance</u> provided by this policy will
> terminate as to that auto on the effective date of the
> other insurance.

*Id*. at 548 (emphasis added). The insurer argued that when the
policyholder obtained a second insurance policy with another auto
insurance carrier that listed the subject vehicle as covered, the
automatic termination provision in the first policy was triggered
because the second policy was "similar" to the first policy. *Id*.
Judge Shubb, in a decision not binding upon another district
court, held that the termination provision was not plain and
clear as a matter of law:

> The provision only operates to terminate "similar
> insurance provided by this policy" in the event that
> "[the insured] obtains other insurance on 'your covered
> auto.'" "Similar" is not defined by the policy and may
> be used in English to mean the "same" or "identical"
> though it is defined as "showing some resemblance;
> related in appearance or nature; alike though not
> identical." American Heritage Dictionary 1206
> (1979).[FN1] It is difficult to imagine being called
> upon to interpret a more imprecise term. This inherent
> vagueness fully justifies the conclusion that the term
> "similar" is ambiguous. Under applicable rules of
> interpretation, therefore, the court cannot interpret
> "similar" to mean "showing some resemblance" for that
> would be to resolve the ambiguity in favor of the
> insurer.
>
> > FN 1. The full usage note in the American Heritage
> > Dictionary provides: "<u>Similar</u>" is often misused
> > in nontechnical contexts where <u>same</u> or <u>identical</u>
> > would convey the sense actually intended.

*Id*. at 550.

That court noted that even though the two disputed insurance
policies were similar in providing for automobile insurance, they

were not "similar" as a matter of law because each policy contained different limits for third party liability, a difference that the court considered would be "significant in the eyes of the insured." *Id.* at 550-51.

*Motors* and the related cases[7] cited by CDI are not persuasive. First, assuming, *arguendo,* that the *Motors* court was correct to conclude that the term "similar" is inherently ambiguous, by interpreting it to mean "the same" or "identical," the court did not perform the required analysis (i.e., examining whether the ambiguity is eliminated by the language and context of the policy). CDI's implied assertion that "similar" should be defined as the "same" or "identical" defeats the purpose of the exclusionary provision at issue in this case: to avoid moral hazard. If "the same" or "identical" were the intended meaning, a narrower, more precise term could have been utilized. *Motors* relied heavily on the premise that the differences between the two auto insurance policies, including different limits for third party liability, would have been "significant in the eyes of the insured." This focus is misplaced, because there is no social

---

[7] CDI points out that the reasoning in *Motors* has been applied in other jurisdictions. *See S.C. Farm Bureau Mutual Ins. Co. v. Courtney*, 536 S.E. 2d 689, 691-93 (S.C. App. 2000) (citing *Motors* for the proposition that "similar" is ambiguous; rejecting auto insurer's argument that two policies are sufficiently similar to trigger a terminating clause simply because they both provide first party liability insurance); *United Fire & Casualty Co. v. Victoria*, 576 N.W. 2d 118 (Iowa 1998) (finding the term "similar" ambiguous and rejecting auto insurer's argument that, despite differences between two policies, they are "similar" as a matter of law because they covered the same vehicle and provided the same general type of coverage).

utility to interpreting a term to encourage and compensate unlawful conduct by the insured.

CDI references *Caldwell v. Transportation Insurance Company*, 364 S.E. 2d 1 (1988), which concerned an exclusion in a drilling equipment policy. The policy excluded coverage for: "property while in the cofferdams or while below the ground surface in mining, tunneling or similar operations...." *Id.* at 2. After the insured's equipment was damaged while being used to drill almost 300 feet underground, the insurer denied coverage. The Virginia Supreme Court found that the exclusion was not sufficiently clear and unambiguous:

> The well drilling operation was neither "mining," nor "tunneling," so as to be excluded by the specific terms of clause 2(c) nor does the insurer so contend. Rather, insurer and insured debate whether well drilling is a "similar operation" so as to be excluded under the general language of that clause. Both similarities and differences are pointed out, and earnestly argued, between mining and tunneling, on the one hand, and well drilling on the other. A reasoned argument can be made either way, and the existence of such a reasonable difference of opinion is alone sufficient to answer the question before us. In *Nusbaum*, resolving a similar debate concerning the applicability of an exclusionary clause, we said:
>
> > Thus, the question in this case is resolved by the mere fact that reasonable men, including experts on the subject...may reach reasonable, but opposite, conclusions...It was incumbent upon the insurer to employ exclusionary language clear enough to avoid any such ambiguity, if it wish to exclude coverage... [citation]
>
> We need not resolve the question whether well drilling is a sufficiently "similar operation" to mining or tunneling to come within the ambit of clause 2(c), nor need we resort to the rule *ejusdern generis* urged by the insured, to decide the scope of general language which follows specific terms in a contract. Instead, applying the rule of interpretation set forth in *Nusbaum*, we hold that the language of Clause 2(c) is insufficiently precise to excluded coverage of the loss.

*Id*. at 3.  This case is not persuasive, as the legal framework applied by the Virginia Supreme Court is distinguishable from that applicable in California, where courts are required to examine whether any ambiguity can be eliminated by the language and context of the policy.

More relevant is *United Pacific Insurance Company v. First Interstate Bancsystems of Montana*, 664 F. Supp. 1390 (1987), which addressed an excess umbrella policy exclusion for "any obligation for which the insured or any company as its insurer may be held liable under any workmen's compensation, occupational disease, unemployment compensation, disability benefits law, <u>or any similar law</u>...."  *Id*. at 1392 (emphasis added).  The insurer argued that the exclusion applied to preclude coverage for an employee's effort to obtain compensation for common law wrongful termination under Montana law.  *Id*. at 1394.

CDI relies on *United Pacific* to bolster its contention that the term "or any similar law," is ambiguous and should be interpreted in favor of the policyholder.  Doc. 17 at 6-7.  However, *United Pacific's* actual holding is more nuanced.  It is:  "the policies do not unambiguously exclude coverage <u>for damages such as those alleged in [the employee's] complaint</u>," and thereafter strictly construed the policy against the insurer.  664 F. Supp. 1394 (emphasis added).  *United Pacific* found the "any similar law" language was susceptible to the interpretation advanced by the insured, namely that a common law wrongful termination claim did not qualify as a law that was "similar" to laws concerning "workmen's compensation, occupational disease, unemployment compensation, [and/or] disability benefits...."

23

Here, by contrast, particularly in light of the purpose of Exclusion 4, the relevant language -- "any similar provision of federal, state or local statutory law or common law" -- is not susceptible to the meaning advanced by CDI, namely that unenumerated state labor laws must be "identical" to the FLSA to qualify for the exclusion.

The purpose of Exclusion 4 is to disclaim coverage for federal, state, and local wage and hour laws, to avoid the moral hazard problem *Farmers* discussed. RSUI observes that the logical extension of CDI's interpretation "would be that RSUI would have to list every wage and hour law in every state, city and community in the United States, a proposition that is manifestly unworkable and absurd." Doc. 18 at 3. RSUI argues:

> In addition, to the extent state and local laws change, such changes might not necessarily be embraced under California Dairies' utterly unworkable approach. The only way for an insurer to accomplish the broad exclusion of claims made under state and local wage and hour laws is by use of the term "similar;" the term "identical," as California Dairies essentially argues, would not achieve this goal. As such, the term "similar" is proper and serves the purposes of putting insureds on notice that claims made under federal, state and local wage and hour laws are not covered under the Policy.

*Id*. This argument is compelling. The policy language "any similar provision of federal, state or local statutory law or common law" is not susceptible to the interpretation advanced by CDI. If the CLC contains a provision that has provisions analogous to those of the FLSA, Exclusion 4 applies.

///

///

24

C.   **Do the Claims Raised in the *Gonzalez* Action Concern Provisions of State Law "Similar" to the FLSA?**

   1.   **CDI's Argument that Substantial Differences Between the CLC and the FLSA Have Been Recognized in the Caselaw.**

It is undisputed that California labor statutes strive "to protect the minimum wage rights of California employees to a greater extent than federal law." *Armenta v. Osmose, Inc.*, 135 Cal. App. 4th 314, 324 (2005). "[T]he state is empowered to go beyond the federal statutes and regulations in adopting protective laws and regulations for the benefit of employees." *Id*. at 322-23. As a result, some California courts have held that "federal authorities are of little assistance, if any, in construing state laws and regulations that provide <u>greater</u> protection to workers." *Id*. at 322-23 (emphasis added).

CDI argues that "[i]f the FLSA is of little assistance in construing those provisions of the Labor Code that provide greater protection to employees, it can hardly be said that the FLSA and the Labor Code are 'similar' as a matter of law." Doc. 17 at 8. This reads too much into a court's reluctance to rely upon cases interpreting the FLSA, when interpreting the more stringent requirements in the CLC. Whether the state laws are "similar," as that term is reasonably interpreted in the context of the Policy, requires analysis of whether the CLC provisions raised in the *Gonzalez* action have characteristics in common (are "similar") with provisions in the FLSA.

   2.   **First Cause of Action for Unpaid Minimum Wage.**

The first cause of action in the *Gonzalez* complaint alleges

that CDI failed to pay plaintiffs a minimum wage as required under CLC §§ 1197, 1194 and 1194.2. CLC § 1197 states: "[t]he minimum wage for employees fixed by the commission is the minimum wage to be paid to employees, and the payment of a less wage than the minimum so fixed is unlawful." With respect to overtime, the FLSA provides in pertinent part:

> Every employer shall pay to each of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, wages at the following rates...

29 U.S.C. § 206.

RSUI argues that because "the FLSA and its California counterpart both provide for the payment of a minimum wage," the statutes are "'similar' if not nearly identical," triggering Exclusion 4. Doc. 10 at 13.

CDI rejoins that, although both the FLSA and the CLC contain provisions that deal with minimum wage, there are significant differences between the approach taken in both bodies of law. CDI again cites *Armenta v. Osmose, Inc.*, 135 Cal. App. 4th at 324, which concerned the method to be used in calculating whether a minimum wage violation had taken place. The employer in *Armenta* argued that the court should apply the "averaging formula," a method of wage calculation used by a numerous federal courts in other jurisdictions to assess minimum wage violations under the FLSA. *Id.* at 322.

The *Armenta* court concluded that, although "California courts have long recognized that California's wage laws are patterned on federal statutes and that authorities construing those federal statutes provide persuasive guidance to state

26

courts," *id*. at 322, cases interpreting the FLSA are of little assistance when evaluating provisions of California law that provide <u>greater</u> protection to workers, *id*. at 323. In reaching this conclusion, *Armenta* reasoned that, "the minimum wage provisions of the FLSA differ significantly from California's minimum wage law." *Id*. Specifically, while the FLSA, "requires payment of minimum wage to employees who 'in any work week' are engaged in commerce," CLC § 1194(a) provides that, "any employee receiving 'less than the legal minimum wage' is entitled to recover the unpaid balance of the 'full amount' owed." *Id*. "A review of [California's] labor statutes reveals a clear legislative intent to protect the minimum wage rights of California employees to a greater extent than federally." *Id*. at 324. Therefore, "[w]hile the averaging method utilized by the federal courts ... may be appropriate when considered in light of federal public policy, it does not advance the policies underlying California's minimum wage law and regulations." *Id*.

 *Armenta* is distinguishable, because it concerned whether and to what extent California courts interpreting and applying the CLC should rely on federal precedent interpreting and applying less protective provisions in the FLSA. Here, in contrast, the question is whether the CLC provisions concerning minimum wage have characteristics in common with the parallel FLSA provisions. They do. RSUI's motion to dismiss is GRANTED as to coverage for the First Cause of Action in *Gonzalez* WITHOUT LEAVE TO AMEND.

  3. <u>Second Cause of Action for Unpaid Overtime Wages.</u>

 The second cause of action in the *Gonzalez* case alleges that

CDI did not pay regular and overtime wages in violation of CLC §§ 200, 204, 500, 510, 512, and 1194, as well as section 3 of Industrial Welfare Commission ("IWC") Wage Order 8.[8] CLC § 200 defines "wages," while CLC § 204 provides for semi-monthly payments of wages earned. CLC §§ 500 and 510 provide for the payment of overtime wages for any hours worked over 8 hours a day and 40 hours per week. Section 3 of IWC Wage Order 8 mirrors the CLC provisions.

The FLSA counterpart to the aforementioned state statutes provides in pertinent part:

> Except as otherwise provided in this section, no employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed.

29 U.S.C. § 207.

RSUI argues that the FLSA and its California counterpart are "similar," because "both provide for the payment of overtime wages, with the only difference [in] the calculation of when overtime hours accrue." Doc. 10 at 14. RSUI further emphasizes that the two sets of provisions "support the identical purpose, to compensate employees for hours worked in excess of a certain amount of hours worked, whether it be in excess of 40 hours in a

---

[8] The caption of the second cause of action indicates that it is based upon CLC §§ 200, 204, 221, 223, 226.7, 500, 510, 512, and 1194, as well as Wage Order 8. However, the body of the cause of action only references Labor Code §§ 200, 204, 500, 510, 512, 1194 and section 3 of Wage Order 8.

28

week or 8 hours in a day."  *Id*.

CDI, not surprisingly, focuses on the differences between the state and federal overtime requirements, the most notable of which is the California requirement that, "[a]ny work in excess of eight hours in one workday ... shall be compensated at the rate of no less than one and one half times the regular rate of pay for an employee," regardless of how many hours the employee works during the work week.  CLC § 510.  CDI also correctly points out that California's overtime law further distinguishes itself from the FLSA's overtime provisions by requiring that, "[a]ny work in excess of twelve hours in one day shall be compensated at the rate of no less than twice the regular rate of pay for an employee."  *Id*.  Moreover, California requires that an employee who works seven consecutive days must be compensated at a rate of one and one half times the regular rate of pay for the first eight hours worked on the seventh day of work in any one workweek, and twice the rate of pay for work thereafter.  *Id*.

Finally, CDI emphasizes the fact that the language of CLC § 510 has led to a significant amount of litigation regarding the proper interpretation of the term "hours worked."  This term was at issue in *Morillion*, 22 Cal. 4th 575, where a group of agricultural employees sued their employer to recover compensation for time spent commuting to and from the employer's fields on employer provided buses.  The employees alleged that the time spent commuting on the employers' buses constituted "hours worked" for purposes of calculating their overtime pay under Industrial Wage Commission Order 14-80.  The employer argued that federal caselaw applying FLSA provided guidance.  The

29

FLSA, unlike Wage Order 14-80, does not contain a definition of the term "hours worked." *Id.* at 588.

Morillion rejected the employer's argument, concluding that "the federal statutory scheme, which differs substantially from the state scheme, should be given no deference." *Id. Morillion* criticized the appellate court's assessment of the similarity of the federal and state overtime statutes:

> [T]he Court of Appeal determined that "[t]he federal statutory scheme is not identical to the California scheme but the thrust of the laws is similar." Absent from this determination, however, is any analysis of what aspect or characteristic of these two extensive statutory schemes make their "thrust[s] ... similar." In determining how much weight to give federal authority in interpreting a California wage order, courts are cautioned to make this comparative analysis (citation omitted), which we undertake here. First, we recognize that the FLSA does not include an express definition of "hours worked," except "in the form of a limited exception for clothes changing and wash up time" under 29 [U.S.C.] § 203(o).

*Id.* (emphasis added). *Morillion* further reasoned

> In discussing federal authority, [] the Court of Appeal failed to compare the federal [regulatory] definition of "hours worked" to the state definition under Wage Order No. 14-80. While one of our lower courts has recognized the "parallel" nature of the federal and state definitions of "hours worked" the DLSE has underscored the substantial differences between the federal and state definitions in numerous advice letters.

*Id.* at 590. The *Morillion* Court reasoned that, its "departure from the federal authority is entirely consistent with the recognized principle that state law may provide employees greater protection than the FLSA...," and concluded "that where the IWC intended the FLSA to apply to wage orders, it has specifically so stated." *Id.* at 592.

CDI argues that *Morillion* provides guidance in this case

30

because IWC Wage Order No. 8, which governs the compensation scheme for those employees that filed the Underlying Action, does not state that it intended the FLSA to apply to Wage Order No. 8's definition of "hours worked." Doc. 17 at 15. Therefore, according to CDI's argument, a policyholder whose employees fall within the scope of IWC Wage Order No. 8 "would have good reason to interpret the Wage Order and its compensation scheme as completely different from any provision of the FLSA." *Id.*

CDI overreaches. *Morillion* concerns whether and to what extent a court should rely upon precedent from the law of one jurisdiction to interpret the law of another. It has no direct bearing on the interpretation and application of the policy language in this case. *Morillion* does serve to corroborate the general assertion that there are distinctions between the FLSA's overtime provisions and those contained in the CLC, but this is undisputed. The inquiry is whether the CLC overtime provisions "have characteristics in common" with the FSLA. CDI offers no persuasive reason to answer this question in the negative.[9] Both

_____

[9] CDI's also discusses the differences between the FLSA and the CLC's interpretations of the term "regular rate of pay." The FLSA provides that employers must pay at least one and a half times the employee's "regular rate" for hours worked in excess of 40 hours per week. 29 U.S.C. § 207. In contrast, CLC § 510 calculates the "regular rate of pay" by dividing total compensation by the statutory maximum of 40 hours.

The net result of the difference is that calculations under the CLC tend to produce a significantly higher "regular rate," and a correspondingly higher overtime rate as well. Overall, this difference can cause a non-exempt salaried employee whose "regular rate of pay" is calculated pursuant to CLC § 510 to earn 37% more than a non exempt salaried employee earning the same weekly pay and working the same amount of overtime whose "regular rate" is calculated by the FSLA method. *See California Practice*

31

statutes seek to assure that employees are paid overtime for work hours which exceed a defined work period.  The policy exclusion seeks to eliminate coverage for claims arising from an employer's failure to pay wages for "overtime" worked in accordance with federal or similar state laws, which is entirely within the employer's control.  It is irrelevant that the period of overtime worked and amounts of compensation may differ.

RSUI's motion to dismiss is GRANTED as to coverage for the Second Cause of Action in *Gonzalez* WITHOUT LEAVE TO AMEND.

> ### 4.  <u>Third and Fourth Causes of Action for Failure to Provide Meal and Rest Periods or Pay an Additional Hour of Wages.</u>

The third and fourth causes of action in *Gonzalez* allege that CDI failed to provide meal and rest periods or pay an additional hour of wages based on CLC §§ 226.7 and 512, and Section 11 of IWC Wage Order 8.  CLC § 226.7(b) provides:

> If an employer fails to provide an employee a meal period or rest period in accordance with an applicable order of the [IWC], the employer shall pay the employee one additional hour of pay at the employee's regular rate of compensation for each work day that the meal or rest period is not provided.

CLC § 512 governs the length of meal periods and how many hours must be worked to entitle an employee to a meal period.  Section 11 of IWC Wage Order 8 mirrors these provisions of the CLC.  The

_____

*Guide: Employment Litigation*, 11:934-935.  These differences do not negate the fact that the two bodies of law have common characteristics, making them "similar" for purposes of Exclusion 4, i.e., they make employers liable for not compensating overtime in accordance with the law requiring payment of wages as defined by applicable laws of any relevant jurisdiction.

California Supreme Court has characterized the additional hour of pay required by CLC § 226.7 a "premium wage intended to compensate an employee, not a penalty." *Murphy v. Kenneth Cole Productions, Inc.*, 40 Cal. 4th 1094, 1114 (2007). The third and fourth causes of action in *Gonzalez* specifically seek the premium wage of one (1) hour of compensation for every meal and rest period an employee was not provided.

As discussed above, the FLSA requires that employers compensate employees with at least a minimum wage along with time-and-a-half for hours worked beyond forty hours in a week. *See* 29 U.S.C. §§ 206, 207. The implementing regulations expand upon the relationship between payment of wages and meal breaks. As it relates to the allegations in *Gonzalez*, the implementing regulations require that employees be compensated for all rest periods. 29 C.F.R. §§ 785.18-19.

RSUI argues that these two bodies of law should be deemed "similar" because "[t]he purpose of these statutes are identical, i.e., to ensure that employers provide their employees with meal and rest breaks." Doc. 10 at 16.

CDI argues that there are no federal counterparts to the CLC provisions addressing meal and rest periods and that, therefore, the FLSA is not "similar" to these provisions of the CLC. CDI correctly points out that nothing in the FLSA or its implementing regulations requires an employer to provide meal periods. 29 C.F.R. § 785.19(a) simply requires that an employee who is not relieved of all duties while eating his or her meal be compensated for such time at the regular rate. This is a material difference from Labor Code 512(a), which <u>requires</u> a meal

33

period:

> An employer may not employ an employee for a work
> period of more than five hours per day without
> providing the employee with a meal period of not less
> than 30 minutes, except that if the total work period
> per day of the employee is no more than six hours, the
> meal period may be waived by mutual consent of both the
> employer and employee. An employer may not employ an
> employee for a work period of more than 10 hours per
> day without providing the employee with a second meal
> period of not less than 30 minutes, except that if the
> total hours worked is no more than 12 hours, the second
> meal period may be waived by mutual consent of the
> employer and the employee only if the first meal period
> was not waived.

CDI also correctly points out that there is no FLSA counterpart
to CLC § 226.7, which requires that:

> If an employer fails to provide an employee a meal
> period or rest period in accordance with an applicable
> order of the Industrial Welfare Commission, the
> employer shall pay the employee one additional hour of
> pay at the employee's regular rate of compensation for
> each work day that the meal or rest period is not
> provided.

While the FLSA allows an employer to require an employee to
remain on the employer's premises during his or her meal period,
the CLC contains no such permissive language.

Finally, while the FLSA does not require an employer to
provide employees with rest periods, implementing regulations for
the CLC require employers to authorize 10 minutes of paid rest
for every four hours worked.  8 C.C.R. § 11010, et seq.
California also requires payment of an additional hour of wages
at the employee's regular rate for each missed rest period.  CLC
§ 227.6.

Although the expanded state meal and rest benefits are not
identical to the FLSA, as no such expanded benefits are
prescribed by federal law, both the FLSA and state law provide

34

some form of meal and rest benefits.  The benefits are to be paid by and are entirely within the control of the employer, even if the amounts are calculated differently.  The CLC provisions relied upon in the Third and Fourth Causes of action have characteristics in common with the corresponding FLSA provisions and are therefore "similar."

RSUI's motion to dismiss is GRANTED as to coverage for the Third and Fourth Causes of Action in *Gonzalez* WITHOUT LEAVE TO AMEND.

### 5.    Fifth Cause of Action for Failure to Reimburse Employees for Costs Related to Uniforms.

The fifth cause of action in *Gonzalez* alleges that CDI failed to reimburse employees for costs incurred to acquire and/or maintain company-required uniforms in violation of CLC § 2802 and Section 9 of Wage Order 8.  CLC § 2802(a), provides in pertinent part:

> An employer shall indemnify his or her employee for all necessary expenditures or losses incurred by the employee in direct consequence of the discharge of his or her duties...

Section 9 of Wage Order 8 provides that when uniforms are required, they shall be provided and maintained by the employer. "Payment to employees for work uniforms is a part of the employees' compensation and should be considered like any other payment of wages, compensation or benefits."  *In Re Work Uniform Cases*, 133 Cal. App. 4th 328, 337-38 (2005).

The FLSA counterpart to the aforementioned state statutes is found at 29 U.S.C. § 207(e)(2), which states in pertinent part:

> As used in this section, the "regular rate" at which an employee is employed shall be deemed to include all remuneration for employment paid to, or on behalf of,

35

> the employee, but shall not be deemed to include ...
> other expenses, incurred by an employee in the
> furtherance of his employer's interests and properly
> reimbursable by the employer...

29 U.S.C. § 207 (emphasis supplied).  This language <u>excludes</u> from

the calculation of a "regular rate" any expenditure (e.g., the

purchase of employee uniforms) by an employee that is properly

reimbursable by the employer.  The FLSA only requires an employer

to reimburse the employee for furnishing or maintaining clean

uniforms if failure to do so would reduce their wages below the

minimum wage.  *See Hodgson v. Newport Motel, Inc., dba Newport*

*Beach Motel*, 87 L.C. P 33,830, 1979 WL 1975 (S.D. Fla. 1979); *see*

*also Marshall v. Root's Restaurant, Inc.*, 667 F.2d 559 (6th Cir.

1982) (restaurant violated FLSA by requiring waitresses to

purchase uniform as a condition of employment, deducting cost of

uniforms from first week's wages, and thereby reducing wages

below the minimum wage rate).

     Unlike the minimum wage and overtime provisions, it would

not be reasonable to find that these statutory provisions are

"similar."  While the CLC requires employers to reimburse for

uniform expenses whenever uniforms are required, the FLSA only

requires such reimbursement if not doing so would reduce wages

below the minimum wage.  Essentially, the FLSA provision is

designed to prevent various ways employers might undermine the

minimum wage provisions.  The CLC is a stand-alone provision, the

purpose of which is "to protect employees from suffering expenses

in direct consequence of doing their jobs."  *People v. Short*, 160

Cal. App. 4th 899, 905 (2008).  The provisions accomplish

different statutory purposes.  The federal law is to prevent

violation of the minimum wage law.  The state law imposes the cost of <u>any</u> work-required uniform on the employer.  CLC § 2808 finds no close parallel in the FLSA.  The motion to dismiss is DENIED as to the applicability of Exclusion 4 to the Fifth Cause of Action in *Gonzalez*.

### 6.    <u>Sixth Cause of Action for Failure to Comply with Itemized Wage Statement Requirements.</u>

The sixth cause of action in *Gonzalez* alleges that CDI failed to comply with the itemized wage statement provisions contained in CLC §§ 226, 1174(d), and 1174.5, as well as Section 7 of Wage Order 8.[10]  CLC § 226(a) provides in pertinent part that the employer shall provide their employees with:

> an accurate itemized statement in writing showing (1) gross wages earned, (2) total hours worked by the employee..., (3) the number of piece-rate units earned and any applicable piece rate if the employee is paid on a piece-rate basis, (4) all deductions, provided that all deductions made on written orders of the employee may be aggregated and shown as one item, (5) net wages earned, (6) the inclusive dates of the period for which the employee is paid, (7) the name of the employee and his or her social security number..., (8) the name and address of the legal entity that is the employer, and (9) all applicable hourly rates in effect during the pay period and the corresponding number of hours worked at each hourly rate by the employee.

CLC § 226(e) provides penalties for violations of § 226(a) that include:

---

[10]    The Sixth Cause of Action also cites CLC §§ 226.6 and 1175, which provide that employers that violate the wage statement and payroll records requirements may be charged with a misdemeanor.  It is not at all clear how the *Gonzalez* plaintiffs have standing to enforce these criminal provisions of the CLC. They provide no bases for the civil causes of action raised in the Underlying Action.

> fifty dollars ($50) for the initial pay period in which a violation occurs and one hundred dollars ($100) per employee for each violation in a subsequent pay period, not exceeding an aggregate penalty of four thousand dollars ($4,000), and is entitled to an award of costs and reasonable attorney's fees.

Section 7 of IWC Wage Order 8 mirrors CLC § 226.

CLC § 1174(d) requires employers to maintain:

> payroll records showing the hours worked daily by and the wages paid to, and the number of piece-rate units earned by and any applicable piece rate paid to, employees employed at the respective plants or establishments.

CLC § 1174.5 provides for a civil penalty of five hundred dollars ($500) in connection with violations of the payroll records requirement.

RSUI points out that the FLSA's implementing regulations require employers to maintain records of hours worked, rate of pay, total earnings, deductions and date of payment. 29 C.F.R. § 516.2. RSUI appears to concede that there is no federal requirement concerning the provision of wage statements. Nevertheless, RSUI argues that "the unifying purpose of these statutes is unmistakable," and that "[t]he California and federal statutes in this regard are plainly 'similar' as a matter of law." Doc. 10 at 20. RSUI attempts to stretch Exclusion 4 too far. The Sixth Cause of Action in *Gonzalez* directly concerns CDI's alleged failure to provide wage statements. Neither the FLSA nor its implementing regulations require such wage statements. The parties to not address whether an employee can state a private cause of action to enforce the penalty provisions of the statute. The motion to dismiss is DENIED as to the application of Exclusion 4 to the Sixth Cause of Action in

38

*Gonzalez*.  The motion to dismiss is DENIED.

### 7.  Seventh Cause of Action for Failure to Pay Wages Due at Termination.

The seventh cause of action in *Gonzalez* alleges that CDI failed to pay wages due at termination, a claim founded upon CLC §§ 201, 202, and 203.  CLC § 201 provides in pertinent part:

> If an employer discharges an employee, the wages earned and unpaid at the time of discharge are due and payable immediately.

CLC § 202 requires that an employee's wages shall become due and payable not later than 72 hours after quitting his or her employment, while § 203 provides for a thirty-day penalty for any willful violations of sections 201 or 202.

RSUI argues that the FLSA counterpart to these provisions is found at Title 29 U.S.C., section § 206, which states in pertinent part:

> Every employer shall pay to each of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, wages at the following rate...

29 U.S.C. § 206.  RSUI fails to explain how this provision requires payment of wages within a certain timeframe upon termination.  Again, where neither the FLSA nor its implementing regulations address the type of violation alleged in the Underlying Action, it is not reasonable to find that the relevant CLC provision is "similar" to any provision in the FLSA.  The motion to dismiss is DENIED as to the application of Exclusion 4 to the Sixth Cause of Action in *Gonzalez*.

39

**D.   Applicability of Exclusion 7.**

RSUI also asserts Exclusion 7 as a basis for denying coverage for all of the claims in the Underlying Action.

**1.   Estoppel.**

As a threshold matter, CDI asserts that RSUI should be estopped from asserting Exclusion 7 as a basis for denying coverage as Exclusion 7 was not mentioned in the insurer's final denial of coverage letter.  To demonstrate estoppel, "(1) []he party to be estopped must know the facts; (2) he must intend that his conduct shall be acted upon, or must so act that the party asserting the estoppel had the right to believe that it was so intended; (3) the party asserting the estoppel must be ignorant of the true state of facts; and, (4) he must rely upon the conduct to his injury". *Spray,  Gould & Bowers v. Assoc. Intern. Ins. Co.*, 71 Cal. App. 4th 1260, 1262 (1990).  Application of estoppel in the insurance context typically arises from some affirmative, misleading conduct on the part of the insurer. *Spray,* 71 Cal. App. 4th at 1268.  Absent such affirmative conduct, estoppel may arise from silence when the party has a duty to speak, such as where a legal obligation requires disclosure.  *Id.*

The California Fair Claims Practices Regulations, 10 Cal. Code Regs. ("CCR") § 2695.1, *et seq.*, set forth "minimum standards for the settlement of claims which when violated knowingly or on a single occasion or performed with such frequency and to indicate a general practice, shall constitute an unfair claims settlement practice ...."  10 CCR § 2695.1(a)(1).  An insurer violates the fair claims practices and regulations

whenever it "knowingly" commits an act which breaches one of the regulations.  "Knowingly committed" means "performed with actual, implied or constrictive knowledge, including but not limited to, that which is implied by operation of law."  10 CCR § 2695.2(1). 10 CCR § 2695.7(b)(1) provides:

> Where an insurer denies or rejects a first party claim in whole or in part, it shall do so in writing and shall provide to the claimant a statement listing all basis for such rejection or denial and the factual and legal basis for each reason given for such rejection or denial which is then within the insurer's knowledge. Where an insurer's denial of a first party claim, in whole or in part, is based on a specific policy provision, condition or exclusion, the written denial shall include reference thereto and provide an explanation of the application of the provision, condition or exclusion to the claim. Every insurer that denies or rejects a third party claim in whole or in part, or disputes liability or damages shall do so in writing.

Failure to comply with the minimum standards set forth in the regulations provides a basis for a finding that an insurer failed to abide by its duty to disclose for purposes of the estoppel doctrine.  *Spray*, 71 Cal. App. 4th 1260; *Neufeld v. Balboa Ins. Co.*, 84 Cal. App. 4th 759 (2000).

CDI asserts that RSUI violated the requirements of 10 CCR § 2695.7(b)(1) because it did not assert Exclusion 7 in its response to CDI's request for reconsideration.  Complaint at ¶¶ 11, 14.  RSUI rejoins that, 10 CCR § 2695.7(b)(1) explicitly differentiates between insurer requirements for first party claims as opposed to third party claims, requiring specificity in denial only for first party claims.  RSUI asserts that the claims in this case are third party claims, citing *Garvey v. State Farm Fire & Casualty Co.*, 48 Cal. 3d 395 (1989), for the general definitions of the relevant terms:

41

> If the insured is seeking coverage against loss or damage sustained by the insured, the claim is first party in nature. If the insured is seeking coverage against liability of the insured to another, the claim is third party in nature.

*Id.* at 399 & n.2

However, the California Fair Claims Practices Regulations specifically define a "first party claimant" as "any person asserting a right under an insurance policy as a named insured, other insured or beneficiary under the terms of that insurance policy...." 10 CCR § 2695.2(f). Here, by requesting coverage under the Policy, CDI is a "first party claimant," entitling it to a denial that explicitly explains which exclusions apply under 10 CCR § 2695.7(b)(1).

But, this only establishes RSUI's failure to disclose. To establish estoppel, CDI must also demonstrate that it reasonably relied to its detriment on the assertions RSUI made in its final denial of coverage. The Complaint contains no relevant allegations, and RSUI argues that CDI cannot allege reasonable detrimental reliance because RSUI denied coverage from the outset on alternative grounds. At oral argument, CDI requested an opportunity to amend its complaint, asserting that it could, consistent with Federal Rule of Civil Procedure 11, allege the remaining elements of estoppel.[11] This request is GRANTED.

---

[11] CDI also appears to assert that RSUI's failure to advance Exclusion 7 in its final denial of coverage decision constitutes a waiver of its rights to do so in this litigation. CDI does not explain the basis of its waiver theory. To demonstrate waiver, the insured bears the burden of proof to demonstrate that the carrier intentionally relinquished a right or that the carrier's acts are so inconsistent with an intent to enforce the right as to induce a reasonable belief that such

## 2.   Application of Exclusion 7.

As estoppel does not bar RSUI's assertion of Exclusion 7 as a matter of law, the inquiry turns to whether Exclusion 7 here applies.  Exclusion 7 provides that the Insurer shall not be liable to make any payment for "Loss" in connection with any "Claim" made against the "Insured":

>  7. Brought by or on behalf of any <u>Insured</u>, except:
>
> ***
>
>    b. An <u>Employment Practices Claim</u> brought by an
>    Insured Person....

It is not disputed that both CDI and the plaintiffs in the *Gonzalez* action, all of whom are employees or former employees of CDI, are "Insureds," as "Employees" are deemed to be Insureds along with the Policyholder.  Accordingly, Exclusion 7 applies here unless the Employment Practices Claims exception is triggered.

"Employment Practices Claim" is defined as "any Claim alleging an Employment Practices Wrongful Act."  An "Employment

---

right has been relinquished.  *Waller v. Truck Insurance Exchange, Inc.*, 11 Cal.4th 1, 33-34 (1995).  The *Waller* Court held:

>        holding that an insurer waives defenses not asserted in
>        its initial denial of a duty to defend would be
>        inconsistent with established waiver principles by
>        erroneously implying an intent to relinquish contract
>        rights where no such intent existed.  Such a conclusion
>        would contradict the holdings of the majority of
>        California and sister-state cases addressing the waiver
>        issue.

*Id*. at 33.  CDI fails to explain how its waiver theory can be reconciled with the holding in *Waller*.

43

Practices Wrongful Act" is defined at Section II(F) of the Policy as any actual or alleged:

> 1.  Wrongful dismissal, discharge or termination (either actual or constructive) of employment, including breach of an implied employment contract;
>
> 2.  Employment related harassment (including but not limited to sexual harassment);
>
> 3.  Employment-related discrimination (including but not limited to discrimination based on age, gender, race, color, national origin, religion, sexual orientation or preference, pregnancy or disability);
>
> 4.  Employment-related retaliation;
>
> 5.  Employment-related misrepresentation to an Employee or applicant for employment with the Insured organization;
>
> 6.  Libel, slander, humiliation, defamation or invasion of privacy (solely when employment related);
> 7.  Wrongful failure to promote;
>
> 8.  Wrongful deprivation of career opportunity, wrongful demotion or negligent Employee evaluation, including giving defamatory statements in connection with an Employee reference;
>
> 9.  Employment related wrongful discipline;
>
> 10.  Failure to grant tenure or practice privileges;
>
> 11.  Failure to provide or enforce adequate and consistent organization policies or procedures relating to employment;
>
> 12.  Violations of the following federal laws (as amended) including all regulations promulgated thereunder: a. Family and Medical leave Act of 1993; b. Americans with Disabilities Act of 1992 (ADA); c. Civil Rights Act of 1991; d. Age Discrimination in Employment Act of 1967 (ADEA), including the Older Workers Benefit Protection Act of 1990; or e. Title VII of the Civil Rights Law of 1964 (as amended) and 42 U.S.C. Section 1983, as well as the Pregnancy Discrimination Act of 1978;
>
> 13.  Violation of an Insured Person's civil rights relating to any of the above; or

44

> 14. Negligent hiring, retention, training or supervision, infliction of emotional distress, <u>failure to provide or enforce adequate or consistent organizational polices and procedures</u>, or violation of an individual's civil rights, when alleged in conjunction with respect to any of the foregoing items 1 through 13.

*Id.*

CDI argues that the allegations in the *Gonzalez* complaint, namely that employees were denied mandated meal periods, rest periods, reimbursement for employee uniforms, and wages due at termination, involve "Employment Practices Wrongful Acts" because they "reflect employment misrepresentations to employees that Plaintiff would comply with the law regarding such benefits," and/or "involve a failure to enforce adequate or consistent organizational polices relating to employment." Doc. 17 at 25. CDI relies on the "rule" that "insuring agreements are to be interpreted broadly in favor of the policyholder." *Id.*

RSUI disputes CDI's statement of the applicable legal rule, correctly pointing out that while ambiguities in a policy of insurance are to be construed in favor of the insured, "some actual or apparent ambiguity must be present before the rule comes into play," citing *Johnson v. Continental Ins. Co.*, 202 Cal. App. 3d 477, 481 (1988). Such ambiguity "cannot be based upon a strained interpretation of the policy language." *Producers Dairy Delivery Co. v. Sentry Ins. Co.*, 41 Cal. 3d 903, 912 (1986).

CDI's assertion that the CLC violations alleged in the *Gonzalez* complaint should be viewed as "employment-related misrepresentations" is a strained interpretation of the Policy language in light of the facts presented. The *Gonzalez* action is

45

limited to allegations based upon the failure to pay wages and related benefits.  The *Gonzalez* complaint does not allege any misrepresentations by CDI, nor is misrepresentation a required element of any of the Gonzalez causes of action, all of which relate to wage and hour conditions of employment.

The same conclusion applies to CDI's argument that the *Gonzalez* allegations involve failures "to enforce adequate or consistent organization[al] polices relating to employment."  The underlying complaint does not mention or concern internal organizational policies at CDI.  CDI's interpretation of this language in the exception to Exclusion 7 is without limitation, as the Exclusion 7 exception would be triggered for any claims brought by employees against CDI, because any allegedly wrongful act by an employer vis-a-vis an employee <u>could</u> be the subject of an internal organizational policy.  This is not what the Policy intended, or it would have included a blanket exception from Exclusion 7 for claims brought by Employees against an Insured.

The *Gonzalez* Complaint contains no allegations related to any misrepresentations, failures to provide and/or enforce company rules, negligence, or civil rights violations.  The exception for "Employment Practices Wrongful Acts" provided under Exclusion 7 does not here apply.  Accordingly, Exclusion 7 bars coverage for all of the CLC claims in the *Gonzalez* lawsuit, as they are between Insureds and do not qualify as "Employment Practices Wrongful Acts."

RSUI's motion to dismiss is GRANTED as to coverage for all of the CLC claims in the *Gonzalez* lawsuit WITH LEAVE TO AMEND.

46

**E. Eighth Cause of Action for Violation of the Unfair Competition Law.**

The eighth cause of action in *Gonzalez* alleges that CDI violated the Unfair Competition Law ("UCL") as a result of the failure to comply with various provisions of the CLC, as alleged in the *Gonzalez* complaint. The UCL "borrows" violations from other laws by making them independently actionable as unfair competitive practices. *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1144 (2003).

Assuming that RSUI is absolved of the responsibility to provide coverage for each of the other causes of action in the *Gonzalez* lawsuit, RSUI argues that CDI is unable to state a claim for declaratory relief as to coverage for its UCL claim.

CDI rejoins that because a UCL claim can be based on any number of underlying violations of law, it, as the policyholder, "could not have reasonably anticipated that claims under the UCL were 'similar' to the FLSA for purposes of Exclusion 4." Doc. 17 at 18. But, CDI ignores that any "Loss" due to the *Gonzalez* plaintiffs' success on the UCL claim <u>would necessarily result from the underlying CLC violations</u>. Under the UCL, "[p]revailing plaintiffs are generally limited to injunctive relief and restitution." *Korea Supply,* 29 Cal. 4th at 1144. In addition, "an individual may recover profits unfairly obtained to the extent that these profits represent monies given to the defendant or benefits in which the plaintiff has an ownership interest." *Id*. at 1148. Either way, any money damages available under the UCL claim would be as a direct result of the underlying CLC violations. CDI fails to explain why the Policy should cover

47

such losses simply because they are couched as a UCL claim.

The UCL claim is excluded for the same reasons as the underlying claims are excluded under Exclusions 4 and 7. RSUI's motion to dismiss is GRANTED as to coverage for the UCL claim in the *Gonzalez* lawsuit, WITH LEAVE TO AMEND.


## V.   CONCLUSION

For the reasons set forth above, RSUI's motion to dismiss is GRANTED as specifically set forth above. CDI shall have twenty (20) days to amend its complaint in accordance with this memorandum decision.


IT IS SO ORDERED.

Dated:   **March 20, 2009**                     **/s/ Oliver W. Wanger**
                                                 **UNITED STATES DISTRICT JUDGE**